UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>- against -<br><br>DAVID CHERRY,<br><br>Defendant. | **MEMORANDUM**<br>**OPINION & ORDER**<br><br>(S5) 16 Cr. 281 (PGG) |

PAUL G. GARDEPHE, U.S.D.J.:

Defendant David Cherry pleaded guilty to using, carrying, and brandishing a firearm, during and in relation to, and in furtherance of, the narcotics distribution conspiracy charged in the (S5) Indictment.  (See (S5) Indictment (Dkt. No. 418), Count Five)  Cherry's guilty plea arises out of his longtime involvement in the "Blood Hound Brims" (the "Brims"), a large and violent Bloods gang engaged in narcotics trafficking and other crimes.  Sentencing is scheduled for June 4, 2021, at 12:00 noon.

In his sentencing submissions, Cherry objects to those portions of the Pre-Sentence Investigation Report ("PSR") stating or suggesting that

(1) his involvement in the Brims continued after mid-August 2010;

(2) he is responsible for drug trafficking committed by gang members after mid-August 2010;

(3) he was the "acting Godfather" of the Brims while gang leader Latique Johnson was incarcerated;

(4) he ordered that Brims member Saeed Kaid, a/k/a "O-Dog," be killed;

(5) he fired shots at a rival gang member on May 23, 2010; and

(6) he had brought contraband into prison for incarcerated Brims members, and had ordered other Brims members to do the same.

(See June 24, 2019 Cherry Sent. Br. (Dkt. No. 669) at 3-7; Jan. 6, 2020 Cherry Sent. Br. (Dkt. No. 807) at 2-19; PSR (Dkt. No. 508) at 17-19, 22-23)[1]  On August 27, 2019 and November 26, 2019, this Court conducted a Fatico hearing concerning Cherry's objections to the PSR.  (Dkt. Nos. 735, 796)

For the reasons stated below, Cherry's objections to the PSR will be overruled, except as to whether Cherry was expelled from the Brims in 2010.  As to that fact, Cherry's objection is sustained.

## BACKGROUND

### I.    GUILTY PLEA

Cherry is charged in (S5) Indictment 16 Cr. 281 with racketeering conspiracy, in violation of 18 U.S.C. § 1962(d) (Count One); conspiracy to distribute and possess with intent to distribute 280 grams and more of cocaine base, a kilogram and more of heroin, 5 kilograms and more of cocaine, and less than fifty kilograms of marijuana in violation of 21 U.S.C. § 846 (Count Four); and using, carrying, possessing, brandishing, and discharging a firearm during and in relation to, and in furtherance of, the charged racketeering conspiracy and the charged narcotics conspiracy, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i), (ii), and (iii) (Count Five). ((S5) Indict. (Dkt. No. 418))

One of the alleged overt acts committed in furtherance of the racketeering conspiracy is that, "[o]n or about April 3, 2009, in the vicinity of Greenburgh, New York, DAVID CHERRY, a/k/a 'Showtime,' the defendant, along with other members of [the Brims], conspired and attempted to murder another [Brims] member, Saeed Kaid, a/k/a 'O-Dog,' during a

---

[1]  The page numbers in this Order refer to the designated page numbers in this District's Electronic Case Files (ECF) system.

power struggle within [the Brims], in which another [Brims] member shot and injured Kaid." (Id. ¶ 11(a) (emphasis in original))

On November 9, 2018, Cherry pled guilty to a lesser-included offense of Count Five: using, carrying, possessing, and brandishing a firearm, during and in relation to, and in furtherance of, the charged racketeering conspiracy. (See Nov. 9, 2018 Plea Tr. (Dkt. No. 455)) In his allocution, Cherry admitted to displaying a firearm to a member of a rival gang "[t]o scare them off" (id. at 18), but denied any involvement in the Brims' drug trafficking activities. (Id. at 16) Cherry's plea was premised on the notion that racketeering conspiracy could constitute a "crime of violence" under Section 924(c)(1)(A) and (3). (See (S5) Indictment 16 Cr. 281 (Count Five); Aug. 14, 2019 Plea Tr. (Dkt. No. 730) at 2-3)

On June 24, 2019, the Supreme Court issued its decision in United States v. Davis, 139 S. Ct. 2319 (2019), holding that the so-called "residual clause" of 18 U.S.C. § 924(c)(3) is unconstitutionally vague. In the wake of Davis, "the parties agreed that Cherry's allocution was insufficient, as the RICO conspiracy could no longer serve as a 'crime of violence' to support Cherry's guilty plea conviction under Section 924(c)." (Dec. 10, 2019 Govt. Sent. Br. (Dkt. No. 798) at 4) Accordingly, this Court vacated Cherry's plea. (Aug. 14, 2019 Plea Tr. (Dkt. No. 730) at 3)

On August 14, 2019, Cherry again pled guilty to a brandishing violation of Section 924(c)(1)(A), but this time he stated that he had used, carried, possessed, and brandished a firearm in furtherance of the charged narcotics conspiracy.

In the plea agreement, the Government and Cherry stipulated that the Guidelines sentence for Count Five is the minimum term of imprisonment required by Section 924(c), pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 2K2.4(b), and that Chapters

Three and Four of the Sentencing Guidelines do not apply.  (July 23, 2019 Plea Agmt. at 2)  The parties further agreed that the mandatory minimum sentence for a brandishing violation of Section 924(c) is seven years' imprisonment.  (Id.)

During the Rule 11 proceeding, Cherry allocuted that in or about 2008 or 2009, in the vicinity of White Plains Road in the Bronx, he had used, carried, possessed, and brandished a firearm, to protect a Brims' drug trafficking spot.  Cherry stated that he "was standing . . . in . . . front of [a] building where other [Brims] members [were] selling narcotics" when he saw "a rival gang approaching."  Cherry was aware that the Brims were selling crack cocaine, powder cocaine, and heroin at this time.  He was also aware that there had been altercations or disputes with the rival gang, in this neighborhood, in the past.  Cherry was concerned at that time that the rival gang was approaching the Brims' drug selling location with the intention to do harm to his fellow gang members or to himself.  Accordingly, Cherry lifted his shirt to display the firearm that he was carrying, and the rival gang turned around and left.  Cherry testified that he had displayed the firearm to protect himself and his fellow gang members who were selling drugs at the White Plains Road location.  (Aug. 14, 2019 Plea Tr. (Dkt. No. 730) at 19-22)

At the August 14, 2019 plea hearing, the Court reminded Cherry that there would be a Fatico hearing "to determine what role, if any, [Cherry] played in the shooting of a man named [Saeed] Kaid."  The Court also reminded Cherry that its "determination as to whether, in fact, [Cherry] played a role in that shooting is likely to have a significant effect on the sentence [he] will receive, or to say it another way, if [the Court] do[es] conclude that [Cherry] played a role in the shooting of [Saeed] Kaid, [the Court] may well decide to impose a sentence more

severe than the seven-year minimum." Cherry stated that he understood this risk, and that it was

his "decision to move forward with the plea despite that risk." (Id. at 15)[2]

       During the Rule 11 proceeding, the Court also informed Cherry that he should

understand "that while [the Court] can't sentence [him] to less than seven years' imprisonment,

[it] can sentence [him] to more than seven years' imprisonment. Indeed, [the Court has] the

power to sentence [Cherry] to any term of imprisonment between seven years and the statutory

maximum of life imprisonment." (Aug. 27, 2019 Plea Tr. (Dkt. No. 730) at 14)

## II.    PRE-*FATICO* HEARING SENTENCING SUBMISSIONS

       On February 7, 2019, the U.S. Probation Office issued a revised Pre-Sentencing

Report for Cherry. (Dkt. No. 508) On March 28, 2019 – in preparation for sentencing – this

Court issued the following order:

> Defendant Cherry's sentencing in this case is scheduled to take place on April 25,
> 2019. The Court intends to rely on evidence introduced at the trial of Latique
> Johnson, Brandon Green, and Donnell Murray – Cherry's co-defendants – to
> determine Cherry's appropriate sentence. Accordingly, it is hereby ORDERED that
> Defendant Cherry file any submission addressing such evidence by **Thursday, April
> 18, 2019.**

(Dkt. No. 571 (emphasis in original))

       In a June 4, 2019 letter, Cherry's counsel states that, "having now read the entire

transcript from the Johnson trial of three of Mr. Cherry's co-defendants, I believe it is imperative

that Mr. Cherry seek a Fatico hearing, in advance of sentencing. The Fatico hearing would relate

---

[2] This Court had warned Cherry at a July 9, 2019 conference that his "role in the shooting of a
co-defendant named Saeed Kaid, [which] was the subject of extensive testimony in the trial of
Mr. Cherry's co-defendants . . . , is likely to play a significant role in [the Court's] determination
as to what an appropriate sentence for Mr. Cherry should be." (July 9, 2019 Tr. (Dkt. No. 698)
at 2; see also id. at 3 ("Mr. Cherry's alleged role in that shooting is likely to be an extremely
significant factor in [the Court's] determination as to what his sentence should be."))

solely to the shooting of Saeed Kaid on April 3, 2009. . . . [T]he defense intends to introduce testimony that we believe will contradict the testimony of government cooperator Morton." (Dkt. No. 658)

###   A.   Cherry's June 24, 2019 Sentencing Submission

In his June 24, 2019 sentencing submission (Dkt. No. 669), Cherry argues for the statutory minimum mandatory sentence of seven years' imprisonment, and objects to the following factual assertions in the PSR:

- "David Cherry was the Bloodhound Brims' acting 'Godfather' or 'GF.'"

- "Cherry personally facilitated the smuggling of contraband, including razor blades, scalpels, and drugs, into prison. Cherry both ordered other BHB members to bring contraband to specific incarcerated members and brought such contraband himself."

- Cherry ceased to be an official member of the Blood Hound Brims in 2011 or 2012.

- Cherry was involved in the attempted murder of Saeed Kaid, called "O-Dog."

- "On May 23, 2010, in the vicinity of 381 Lenox Avenue in Manhattan, Cherry fired a gun at rival gang members during a dispute outside restaurant/lounge Trattoria Amici, resulting in the injury of two victims."

(See June 24, 2019 Cherry Sent. Br. (Dkt. No. 669) at 3-7 (citing PSR (Dkt. No. 508) at p. 20-21))

As to his role in the Brims, Cherry merely states that "he was never a 'Godfather' of the Blood Hound Brims." (Id. at 3) Cherry also denies that he ever ordered Brims members to bring contraband to incarcerated fellow gang members, or that he did so himself. (Id. at 7) Cherry further contends that his membership in the Brims ended in mid-2010, rather than in 2011 or 2012, as stated in the PSR. In support of this timeline, Cherry states that he left the gang in August 2010 after telling Latique Johnson – the gang's leader – that while Johnson was

incarcerated Cherry had fathered a baby by Johnson's girlfriend.  Cherry submits Johnson's

prison visitor logs to show that his last visit with Johnson was on August 21, 2010.  (Id. at 3; Ex.

A (Dkt. No. 669-1))  Cherry also contends that he was assaulted by Brims members in

September 2011, while he was incarcerated on a state narcotics charge.  (Id. at 3; Ex. B (Dkt. No.

669-2))

        As to the PSR's assertion that Cherry ordered fellow Brims member and co-

defendant Thomas Morton to kill Saeed Kaid, a/k/a "O-Dog," Cherry states that Morton's trial

testimony as to this attempted murder is "an utter fabrication." (Id. at 4)  Cherry also submits the

transcript of an October 16, 2018 interview of Cherry's friend, Ralph Turane, conducted by

Cherry's lawyer.  (June 24, 2019 Cherry Sent. Br., Ex. D (Dkt. No. 669-4))  The interview –

which is discussed in more detail below – was tape-recorded without Turane's knowledge.

(Aug. 27, 2019 Hrg. Tr. (Dkt. No. 735) at 8)  Turane told Cherry's counsel that on the evening of

the attempted murder of Kaid, he and Cherry were headed to a party in Harlem.  (June 24, 2019

Cherry Sent. Br. (Dkt. No. 669) at 5; Ex. D (Dkt. No. 669-4) at 2-9)

        As to the May 23, 2010 shooting at the Trattoria Amici bar-restarant, Cherry cites

Turane's interview, in which he states that Gerard Woodley – and not Cherry – fired the shots

that evening.  (Id. at 6; Ex. D (Dkt. No. 669-4) at 44-46)

        After receiving Cherry's June 24, 2019 sentencing submission, the Court

conducted a conference to discuss the effect of Davis on Cherry's guilty plea, as well as Cherry's

objections to the PSR.  (July 9, 2019 (Dkt. No. 698) at 2, 4-6)  At the July 9, 2019 conference,

this Court expressed

> concern[] about what appears to me to be a significant factual dispute about Mr. Cherry's
> role or alleged role in the shooting of a co-defendant named Saeed Kaid, and that
> shooting was the subject of extensive testimony in the trial of Mr. Cherry's co-defendants

and, quite frankly, is likely to play a significant role in my determination as to what an appropriate sentence for Mr. Cherry should be.

(Id. at 2; see id. at 3 ("Mr. Cherry's alleged role in that shooting is likely to be an extremely significant factor in my determination as to what his sentence should be.")) The Court expressed the view that a Fatico hearing would likely be necessary to resolve the parties' factual disputes. (See id. at 3, 7, 9)

### B. The Government's August 15, 2019 Sentencing Submission

In its August 15, 2019 sentencing submission, the Government argues for an above-Guidelines sentence and counters Cherry's objections to the PSR. (Aug. 15, 2019 Govt. Sent. Br. (Dkt. No. 725)) The Government cites trial testimony and other evidence demonstrating that Cherry (1) was the acting "Godfather" of the Brims when Latique Johnson was incarcerated; (2) had facilitated and participated in smuggling contraband into incarcerated Brims members, and indeed had been "arrested for possession of marijuana while visiting an inmate at Rikers Island." (Id. at 4, 6-7)

As to Cherry's assertion that he had left the Brims in 2010, the Government states that it has "no objection to the years in . . . the PSR being changed" to reflect that Cherry left the Brims in approximately 2010. (Id. at 4) The Government maintains, however, that Cherry continued his involvement in drug-trafficking activity even after leaving the Brims, and that he did so with Brims members in Binghamton, New York. (Id. at 5 (citing Trial Tr. 879-80, 882))

With respect to Cherry's involvement in the attempted murder of Saeed Kaid, a/k/a "O-Dog," the Government contends that "Morton's testimony [about the shooting] was credible and subject to extensive cross-examination," and was corroborated by cooperating witnesses Michael Adams, a/k/a "Measy," and Manuel Rosario, a/k/a "Top Dollar," who also

8

linked Cherry to the Kaid shooting.  (Id. at 8-9)  The Government also contends that Turane's

account of the shooting is not credible.  (Id. at 9-10)

   For similar reasons, the Government challenges Turane's account of the Trattoria

Amici shooting, relying on ballistics evidence that links the gun used at this shooting to a gun in

Cherry's possession less than six months later.  (Id. at 10; Ex. J)

## III.  RELEVANT EVIDENCE

### A.  The Evidence at Trial

   Three leaders of the Brims – Latique Johnson, Brandon Green, and Donnell

Murray – proceeded to trial on February 19, 2019.  All three were charged with RICO

conspiracy, narcotics conspiracy, and use of a firearm during and in relation to, and in

furtherance of, these charged conspiracies.  The charges against these defendants arose out of

their involvement in the Brims' drug trafficking and acts of violence.  Johnson and Murray were

also charged with assault and attempted murder in aid of racketeering.  ((S5) Indictment 16 Cr.

281)  The Government called twenty-one witnesses, including six former members and

associates of the Brims.

   The credible evidence at trial established that in 2005, Defendant Latique

Johnson, a/k/a "La Brim" or "La," established the "Blood Hound Brims."[3]  (See, e.g., GX 183 at

2; GX 189 at 1; Trial Tr. 2136)  From the gang's inception, Johnson was the "Godfather" and its

"undisputed leader."  (See Trial Tr. 1604, 2895)  Johnson founded the Brims while in prison, and

---

[3]  The gang is a "set," or unit, "of the New York Blood Brim Army," which in turn is "a faction
under [the] Bloods," an organization with nationwide reach.  (Trial Tr. 2890; see also id. at 2915
("Blood[s] is a gang . . . all over the United States. . . . There are hundreds of subdivisions under
[the] Blood[s] from East Coast to the West Coast, to all over the globe. . . . Here on the East
Coast our faction of [the Bloods] was the New York Blood Brim Army.")  The New York Blood
Brim Army is structured as a "committee" comprised of the "godfathers" of nine gangs, all of
which are "Brim" sets.  (Id. at 828, 804, 2916)

he recruited members from within the New York State prison system.  (See id. at 159, 2892)
Ultimately, the Brims grew to include approximately 480 members.  (See id. at 160)

The Brims operate pursuant to a complex leadership hierarchy.  At the top of the
chain of command is the "Godfather" or "GF," who is responsible for appointing the heads of
each "pedigree."[4]  (Id. at 164, 167, 554, 1602)  When the Godfather is incarcerated – as Johnson
was for substantial portions of the time period covered by the charged conspiracies (see GX 400,
402, 416, 904, 905) – the "acting GF" manages the gang's activities, pursuant to orders
transmitted by the imprisoned Godfather.  (Trial Tr. 168, 824-25, 2140, 2896)

Three cooperating witnesses – all high-ranking leaders of the Brims – identified
Cherry – who was also known as "Showtime" or simply "Show" – as "the acting GF on the
streets" from about "early [20]08" to "around 2010."[5]  (Id. at 208 (Adams identifying Cherry as
"acting GF"), 229, 814, 816, 818 (Morton testifying that "La controlled the jails and Show
controlled the streets"; Cherry was the "GF" of the Brims); id. at 2896 (Rosario testifying that
"Show" was "the undisputed leader of the streets"))  As leaders of the Brims, Johnson and
Cherry operated in such close coordination that Johnson and other gang members referred to
Johnson and Cherry as "twins."  (Id. at 2896; see id. at 1041, 1198, 817 (Brims member Morton
testifying that Cherry's relationship with Johnson between 2009 and "the end of 2010 or . . .

---

[4]  The Brims were organized pursuant to sixteen geographical sub-units referred to as
"pedigrees."  For example, the Harlem contingent of the Brims was known as the Greyhound
pedigree; the Bronx contingent was known as the 220 pedigree; the Queens contingent was
known as the Beagle pedigree; and the Brooklyn contingent was known as the Bassett pedigree.
(Id. at 160-61, 1702; GX 902)
[5]  These three cooperating witnesses were Michael Adams, a/k/a "Measy," who was the "High
020" of the Greyhound set (Trial Tr. at 167, 225); Manuel Rosario, a/k/a "Top Dollar," who was
the "low 020 for the Greyhound [set]" (id. at 184); and Thomas Morton, a/k/a "Ten Stacks," who
was "the high, Show's right-hand man."  (Id. at 818)

early 2011" was "close . . . like brothers, twins."); <u>see</u> <u>also</u> <u>id.</u> at 1198 (Morton testifying that Cherry and Johnson "were "building a business together" through the gang))

As the "acting GF" or the "GF on the streets," Cherry was responsible for, <u>inter alia</u>, increasing the size of the gang, collecting membership fees or "kitty dues," and making sure that gang members were "all right in the jail and out the jail." (<u>Id.</u> at 816, 1110, 1119-20)

The Godfather and Acting Godfather oversee the pedigrees, which have their own chain of command. In descending order, each pedigree was overseen by a "High 020"; a "Low 020"; a 5 Star General; a 4 Star General; a 3 Star General; a 2 Star General; and a 1 Star General.[6] (GX 901 (Brims leadership chart); Trial Tr. 164)  BHB members are "automatically [supposed] to listen to anybody . . . in the lineup that's higher than [themselves]." (Trial Tr. 1052)  "The only one [who] could really reprimand [Cherry] or tell him what to do and what not to do would be the godfather himself," meaning Johnson. (<u>Id.</u> at 2896)  Cherry was "very highly respected" by gang members and by the larger New York Brim Blood Army. (<u>Id.</u> at 1199-1200)

The evidence at trial established that the Blood Hound Brims engaged in drug trafficking both inside and outside prison. (<u>See</u>, <u>e.g.</u>, Trial Tr. 1014-15 (describing drug trafficking in prison), 355-56 (describing drug trafficking in Elmira, New York), 358-61 (in Syracuse, Pennsylvania, and New York City), 873-74 (in Troy, New York), 879-80 (in Binghamton, New York))  According to Brims member Adams – who was the "High 020" of the Greyhound set and who was incarcerated with Johnson at Auburn Correctional Facility in 2007 (<u>see</u> GX 904) – Johnson "had drugs," including marijuana, in prison, and would "give it to some of the Hounds" in prison who would then use the drugs to obtain food. Johnson told Adams that

---

[6] The "High 020" and "Low 020" are also referred to as the "high OG" and the "low OG." (Trial Tr. 1614, 1663)  The gang's hierarchy also includes a "Godmother." (<u>See</u> GX 901)

Cherry and one of the gang's Godmothers smuggled the drugs into Johnson during prison visits. (Trial Tr. 221-22)  Morton testified that, as Acting Godfather, Cherry was obligated to "make sure" that Brims members "on Rikers Island or . . . upstate prison[s]" were "getting commissary or getting weapons."  (Id. at 816)[7]

Cherry and Morton also participated in robberies of drug dealers in early 2009, and the two men sold drugs together.  (Id. at 999-1002, 1187)

At trial, Morton testified about the 2009 attempted murder of Brims member Saeed Kaid, a/k/a "O-Dog."  In or about 2009, Kaid told Morton and "Tisha" – who was then the Brims' Godmother as well as Johnson's girlfriend – that "he didn't feel [that Cherry] deserved" to be Acting Godfather, "because all he was doing was staying in the house" and watching soap operas.  (Id. at 1017, 1019, 1129-30)  Tisha reported to Cherry what Kaid had said.  (Id. at 1131)  When Cherry learned that Kaid had been criticizing his leadership – or "backbiting" in the Brims' vernacular[8] – he became angry, both with Kaid and with Morton, for not defending him. (Id.)  Cherry told Morton that "he wanted to take O-Dog . . . out to dinner," meaning he wanted to "take him and kill him."[9]  (Id. at 1020, 1133)  Morton agreed.  (Id. at 1020, 1134)

One evening, Cherry instructed Morton to "lure[ ]" Kaid down to a car in which he, Cherry, and Cherry's friend were waiting.  Morton was to tell Kaid that they were on their

---

[7]  Cherry communicated with Brims members in prison through a "universal P.O. Box that all Blood Hound Brims used to write [to], and through [prison] visits."  (Trial Tr. 2928-29)

[8]  Each Brims member took an oath to the gang and was given a booklet of rules.  (Id. at 826, 2135-37, 2892)  Gang members were also bound by the "Ten Hound Commandments."  Number 7 states, "Never backbite, harm a Hound . . . in anyway or let anyone do so."  (GX 174 at 9)

[9]  In order to avoid detection by law enforcement, Brims members commonly used coded language, referred to as "lingo."  The gang's coded language was recorded in written documents referred to as "paperwork."  The "paperwork" was transmitted to incarcerated and non-incarcerated Brims members, and was updated periodically as the codes changed over time. Documents reflecting the gang's coded language were introduced at trial.  (Trial Tr. 164-66, 188, 821; GX 170-71, 174-75, 179, 183-85)

12

way to rob an individual Kaid had discussed as a target.  (Id. at 1020-21, 1134)  Morton drove

with Cherry in the passenger seat, and with Kaid and Cherry's friend in the backseat.  After

picking up Kaid, Morton took a highway north.  (Id. at 1021)  Once outside the city, Morton

pulled over to the side of the road "on some type of hill" in a heavily wooded area.  It was dark.

Morton got out, opened the car door for Kaid, and instructed him to get out of the car.  (Id. at

1022)

       Kaid got out of the car and "backed up a little bit."  When he did, Morton shot

him four times with a .45 caliber handgun.  (Id. at 1022, 1135)  Cherry then "ran around [the car]

and tried to take the gun from [Morton]" to "shoot [Kaid] again" and "finish the job, but there

[were] no more bullets in the gun."  (Id. at 1022-23, 1135)  After the shooting, Cherry and

Morton got back into the car and left Kaid for dead on the side of the road.  (Id. at 1023, 1135-

36)

       Kaid survived the shooting and was hospitalized.  After Morton learned that Kaid

was still alive, he called him in the hospital "to, you know, let him know that [he] was like happy

that [Kaid] didn't die."  Morton told Kaid to "keep it regular," and "keep it easy," meaning,

"don't tell . . . [t]he police" who had shot him.  (Id. at 1023-24)

       A few months later, Morton learned that – shortly after the shooting – Kaid had

told the police that Morton had shot him.  (Id. at 1024)  Morton was arrested for the shooting.

Morton lied when questioned by the police, saying that he didn't know anything about the

shooting.  Morton was then released without charges.  (Id. at 1024-25, 1138-44)  That day, he

told Cherry that Kaid had told the police about the shooting.  Cherry responded that "he was

going to handle it."[10]  At that time, Kaid was being held on Rikers Island, where Johnson was also in custody.  (Id. at 1026)  Cherry later told Morton that Kaid "got the button pushed on him," meaning that because he had "violated the gang's rules . . . , any gang member that sees [Kaid], they have the right to put hands on [him], beat [him] up or cut [him] or whatever."  Kaid was badly beaten while in custody on Rikers Island and "ended up getting his jaw broke[n]."  (Id. at 1027)

At some point in 2010, the close relationship between Cherry and Johnson ended.  Unbeknownst to Johnson, his girlfriend Tisha began an affair with Cherry, and she became pregnant with Cherry's child.  (Id. at 1113-14)  Tisha gave birth while Johnson remained incarcerated.  (Id. at 1042)  Morton and Cherry told Johnson that the baby was not his, and that Cherry was the father.  (Id. at 1045-46)  During a prison visit with Morton a few weeks later, Johnson instructed Morton "to peter roll Show," meaning to kill him.  (Id. at 1047)  Morton was close friends with Cherry, however, and had no intention of killing him.  Morton led Johnson to believe that he was going to kill Cherry, however.  (Id. at 1048)  Johnson also terminated Cherry as a member of the Brims.[11]  (Id.)  After Cherry was kicked out of the gang, Johnson promoted Morton to Acting Godfather.  (Id. at 1033-34, 1049)

Morton stayed in close contact with Cherry and other members of the Brims even after his expulsion from the Brims.  He and Morton continued to sell drugs together in Binghamton, New York.  (Id. at 1187-88, 1200)  In 2011, when Morton was incarcerated and no

---

[10]  The rules governing membership in the Brims state there is to be "no snitching."  (Trial Tr. 826)

[11]  Rule Number 7 of the "Ten Hound Commandments" provides that a gang member should "[n]ever . . . harm a Hound in anyway . . . (including sex wit[h] a Hound Wife/Husband Girlfriend. . . ."  (GX 174 at 9)

longer a member of the Brims,[12] Cherry smuggled scalpels and drugs to him in prison.  (Id. at 1188-89)

On March 27, 2019 – after a five-week trial – the jury returned a verdict finding Johnson, Green, and Murray guilty on all counts.  (Verdict (Dkt. No. 570))

Morton was a fully credible witness at trial.  His testimony concerning Cherry's leadership role in the gang and in the attempted murder of Kaid was corroborated by fellow gang members and cooperating witnesses Michael Adams and Manuel Rosario.  The Court also found credible Morton's testimony concerning Cherry's smuggling of contraband into prison.  The latter point is corroborated by Johnson's visitor logs at Rikers Island and Cherry's arrest for possession of marijuana at Rikers Island.  (See Aug. 15, 2019 Govt. Sent. Br., Exs. G, H (Dkt. No. 725))

### B.     *Fatico* **Hearing**

On June 4, 2019, Cherry filed a letter requesting that the Court conduct a Fatico hearing concerning Cherry's alleged involvement in the shooting of Kaid.  (Dkt. No. 658)  In connection with his June 24, 2019 sentencing brief – filed in advance of the Fatico hearing – Cherry submitted a transcript of an interview defense counsel had conducted of Ralph Turane.  (June 24, 2019 Cherry Sent. Br., Ex. D (Dkt. No. 669-4))  Turane is a friend of Cherry, and he was with Morton and Cherry when Kaid was shot.  Cherry's counsel tape-recorded the interview without Turane's knowledge.  (Aug. 27, 2019 Hrg. Tr. (Dkt. No. 735) at 8)

Cherry's counsel also urged the Court to limit the Fatico hearing solely to the issue of whether Cherry had participated in a scheme to murder Kaid.  (See Oct. 1, 2019 Cherry

---

[12]  Morton left the Brims in November 2011, because he believed that Johnson no longer trusted him.  (Trial Tr. 1115, 1118)

Ltr. (filed under seal))  Given that Cherry had objected to portions of the PSR unrelated to the

Kaid shooting, the Court denied that application in an October 3, 2019 order:

> The Court informed Cherry's counsel long ago that it would consider the trial testimony
> in U.S. v. Johnson in determining an appropriate sentence for Cherry.  The shooting of
> Kaid emerged as a point of dispute, and the Court advised the parties that Cherry's role in
> that incident could affect his sentence.  The Government has stated that it wishes to call
> Thomas Morton to testify about the shooting of Kaid as well as other conduct engaged in
> by Cherry in connection with his participation in the Blood Hound Brims.  All of this
> evidence is relevant to the Court's determination as to an appropriate sentence for Cherry
> and the application to restrict the scope of the hearing is denied.

(Oct. 3, 2019 Order (filed under seal))[13]

### 1. Cherry's Counsel's Tape-Recorded Interview of Turane

Defense counsel interviewed Ralph Turane on October 16, 2018, recorded the

interview without Turane's knowledge (Aug. 27, 2019 Hrg Tr. (Dkt. No. 735) at 8), and had the

interview transcribed.  During the interview, Turane stated that – on the evening that Kaid was

shot – he and Cherry were headed to a party in Harlem, and were dressed accordingly.  Morton

was not going to the party.  (June 24, 2019 Cherry Sent. Br., Ex. D (Dkt. No. 669) at 6-9)

Morton, Cherry, and Turane picked up Kaid at his apartment; Kaid was not dressed for a party.

(Id. at 12-14)

Morton drove outside of the city.  After some small talk, including about the

party, Turane texted Cherry to ask where they were going.  Cherry asked Morton, who said "I

just gotta go do something.  We got time, don't even worry about it."  (Id. at 18-21)  Morton then

had a heated exchange with Kaid about Kaid allowing someone speak ill of Morton.  (Id. at 21-

23)  Morton then pulled over to the side of a dead-end road, and Morton and Kaid got out of the

---

[13]  On October 7, 2019, Cherry's counsel again requested that the scope of the Fatico hearing be
limited to the Kaid shooting.  The Court denied that request on November 25, 2019, stating that
it would "consider all relevant evidence in sentencing Cherry."  (Dkt. No. 781)

car.  According to Turane, Cherry tried to "diffuse the situation."  (Id. at 25-26)  Morton then

shot Kaid five times.  (Id. at 26, 28-29)  Turane got out of the car, but Morton instructed him to

get back into the car.  (Id. at 26-27)  Turane saw that Cherry had moved to the driver's side of

the car, but he did not observe or hear Cherry ask Morton for the gun.  (Id. at 36-37, 39)

According to Turane, Cherry tried to calm Morton down.  (Id. at 38)  After Morton shot Kaid, he

drove back to the city, and dropped Turane off in the Bronx.  (Id. at 29)

## 2.     **Testimony at the *Fatico* Hearing**

Cherry's Fatico hearing began on August 27, 2019.  Cherry called Turane to

testify.  Turane refused to answer any substantive question about his activities on the evening of

the Kaid shooting, however, asserting his Fifth Amendment privilege against self-

incrimination.[14]  (Aug. 27, 2019 Hrg. Tr. (Dkt. No. 735) at 12-13, 22-42, 49)  Given Turane's

assertion of his Fifth Amendment privilege, the hearing on August 27, 2019 consisted primarily

of defense counsel playing excerpts of his previously recorded interview of Turane.

On November 26, 2019, the Fatico hearing resumed.  The Government called

cooperating witness and fellow gang member Thomas Morton to testify.  Morton's testimony

concerning the attempted murder of Kaid was fully consistent with, but more detailed than, his

trial testimony.

---

[14]  Cherry argued that Turane should not be permitted to assert his Fifth Amendment privilege.
(Aug. 26, 2019 Cherry Ltr. (Dkt. No. 728); Aug. 27, 2019 Hrg. Tr. (Dkt. No. 735) at 12, 15-17,
23, 44)  The Court concluded that – given Turane's presence in the car with Morton and Cherry
when Kaid was being driven to the murder scene – Turane had a credible concern that his
answers might tend to incriminate him.  (Aug. 27, 2019 Hrg. Tr. (Dkt. No. 735) at 13-20, 23, 44-
45)  With respect to the five-year statute of limitations, the Court noted that the charges against
Johnson, Green, and Murray were premised on conduct that in "many instances . . . took place
far outside the five years, and that's because it was brought as a RICO [conspiracy]."  (Id. at 19)

Morton testified that Kaid had stated that Cherry should not be the acting godfather of the gang, because he didn't work hard enough; "all he does is stay home and watch TV shows and soap operas." (Nov. 26, 2019 Hrg. Tr. (Dkt. No. 796) at 13, 87-88) As a result of Kaid's "backbiting," Cherry told Morton that they would have to kill Kaid. (Id. at 14, 88-89) According to Morton, it was Cherry's idea to lure Kaid into the car by telling Kaid that they were going to rob a drug dealer Kaid had been eager to target. (Id. at 16-17, 25-26, 95-96)

Morton and Cherry picked up Turane on the way to Kaid's apartment. Morton testified that he did not know whether Cherry had spoken with Turane about the plan to kill Kaid. (Id. at 20, 97-98) However, Morton described Turane as Cherry's "little man . . . his little groupie, his little follower, his flunky," and "his little puppy" who did "whatever [Cherry] t[old] him to do." (Id. at 17-18, 99) According to Morton, when they picked up Kaid, he left his cell phone and wallet at his apartment, because Kaid understood that they were going to commit a robbery that evening. (Id. at 22-23) Morton drove; Cherry sat next to him; Kaid sat behind Morton; and Turane sat behind Cherry. (Id. at 24)

Morton drove to a remote location off the highway. Morton pulled over to the side of the road and got out of the car. He opened Kaid's door and told him to get out. Morton then shot Kaid four times. (Id. at 26-32) Kaid fell to the ground. (Id. at 33) Cherry got out of the car, walked around to the driver's side with his hand out and said, "let me see," which Morton understood to be a request for the gun. There were no more bullets in the gun, however. (Id. at 35-38) Morton then drove away with Cherry and Turane, leaving Kaid laying by the side of the road. (Id. at 39-40)

Cherry later told Morton that Kaid had survived the shooting. Cherry gave Morton Kaid's phone number at the hospital, where he was recovering from his wounds. (Id. at

18

41-42)  Morton called Kaid and told him not to answer any questions from the police about the shooting.  (Id. at 42-43)  A few months later, Morton learned that Kaid had in fact spoken with the police about the shooting, and Morton was arrested for shooting Kaid.  (Id. at 43-44)  Morton immediately informed Cherry that Kaid had spoken with the police about the shooting.  (Id. at 45)  Cherry said he would handle the situation.  (Id. at 46)  Kaid was beaten up and had his jaw broken.  (Id. at 47)

After Morton was released from jail, Morton, Cherry, and two others – including an individual from another gang who went by the nickname "Dollar"– drove to Kaid's home. Cherry handed Dollar a gun.  Dollar got out of the car and put the gun to Kaid's head.  Dollar pulled the trigger, but the gun did not fire, and Kaid ran away.  (Id. at 49-53)

When asked about his prior interactions with Kaid, Morton testified that he supplied heroin to Kaid, who sold the drugs and "would give [Morton] money in return."  At some point, Kaid had "messed up a hundred dollars and some change" with respect to an amount of heroin that Morton had supplied.  When Morton confronted him, Kaid simply said, "Yo, bro, I'm short."  (Id. at 83-87)  Morton testified that Kaid's failure, on this occasion, to pay Morton all of the money he owed for drugs Morton had supplied "didn't really play a part" in his shooting of Kaid.  Morton noted that if he had been concerned about Kaid's failure to fully repay him, he probably would have shot Kaid when it happened.  (Id. at 89-90)

Morton also testified about a shooting that took place at Trattoria Amici, a bar-restaurant located near Harlem Hospital.  Cherry hosted a joint birthday party there – for himself and Morton – in May of 2009 or 2010.  "All the Hounds, all the Bloods, family and friends" were invited to the party.  (Id. at 54-55)  Morton and Cherry had brought guns to the party; Morton's brother – who is a party promoter – was working at the club that night and let them in.

19

At some point during the party, "[a] little scuffle broke out" between Brims and "some other

guys," and "[p]eople started getting pushed out of the party.  Then somebody got shot" outside

the club.  Morton was inside the club at the time, and did not observe the shooting.  (Id. at 56)

Cherry later told Morton that it was "[his] bad" for messing up the party, explaining that he had

shot a woman.  Cherry later threw the gun out the window of his apartment during a visit by a

parole or probation officer.  (Id. at 57-58)

            At the Fatico hearing, Morton repeated his testimony about Johnson expelling

Cherry from the Brims, Johnson's direction to kill Cherry, and Morton's refusal to kill Cherry.

(Id. at 64)  Morton testified that he and Cherry remained close friends; they sold crack cocaine

and heroin together in Binghamton.  Cherry supplied the crack and heroin that they sold there.

(Id. at 65-68)  Cherry lived with Morton in Binghamton, and Morton helped Cherry find local

customers for the heroin.  (Id. at 69-70)  Cherry continued to sell drugs out of Morton's house in

Binghamton after Morton was incarcerated.  (Id. 71-72)

            As at trial, Morton testified that Cherry had brought Morton drugs when he was in

prison, and had assisted others in smuggling drugs and a scalpel into prison.  (Id. at 77-79)

Morton also testified that Cherry had smuggled drugs and scalpels into prison for other inmates.

(Id. at 79)

            Finally, the Government showed Morton a 2014 photograph of Cherry and others

making certain hand gestures.  Morton testified that the hand gesture Cherry and the others were

making was "a gang sign," "a Brim sign," "a Bloods sign."  (Id. at 80; GX 112)

            After the Fatico hearing, the Court informed the parties that it was "contemplating

a substantial upward variance from the Guidelines range of seven years' imprisonment," and

invited the parties to address this issue in supplemental sentencing submissions.  (Dkt. No. 786)

# DISCUSSION

## I. LEGAL STANDARDS

    At sentencing, disputed factual issues are subject to the preponderance of the evidence standard.  United States v. Ruggiero, 100 F.3d 284, 290 (2d Cir. 1996) (noting that the Government has the burden to prove disputed facts at sentencing by a preponderance of the evidence).  Moreover,

> federal sentencing statutes provide that the sentencing court, "in determining the particular sentence to be imposed, shall consider," inter alia, "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), and that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence," id. § 3661.  "'[H]ighly relevant – if not essential – to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics.'  Allowing consideration of such a breadth of information ensures that the punishment will suit not merely the offense but the individual defendant."

United States v. Delacruz, 862 F.3d 163, 175 (2d Cir. 2017) (quoting Wasman v. United States, 468 U.S. 559, 564 (1984)).  Accordingly, in sentencing a defendant, a district court may consider conduct to which a defendant did not plead guilty, as long as doing so "does not increase either the statutory minimum or maximum available punishment."  See United States v. Ulbricht, 858 F.3d 71, 128 (2d Cir. 2017) (finding no Constitutional error in considering – at defendant's sentencing following conviction at trial – "uncharged facts", including "six drug-related deaths" and "attempted murders for hire") (citing United States v. Ryan, 806 F.3d 691, 693-94 (2d Cir. 2015) (finding no error where, at sentencing following a guilty plea, the district court resolved a factual dispute regarding the number of victims)).

II.      **ANALYSIS**

A.      **Cherry's Role as Acting Godfather of the Blood Hound Brims**

Cherry objects to the PSR's characterization of him as a "Godfather" of the Blood Hound Brims (PSR ¶ 17), arguing that the Government is making "a backdoor attempt at a leadership enhancement," which does not apply under the terms of the plea agreement.  (Jan. 6, 2020 Cherry Sent. Br. (Dkt. No. 807) at 19-20; see also June 24, 2019 Cherry Sent. Br. (Dkt. No. 669) at 3)  Other than denying that he was a leader of the Brims, Cherry offers little to refute the Government's evidence.

At trial, as discussed above, the Government offered compelling evidence of Cherry's leadership role in the Brims.  Three cooperating witnesses – all high-ranking leaders of the Brims – identified Cherry as "the acting GF on the streets" from Johnson's incarceration in 2008 to 2010, when Johnson expelled Cherry from the gang.  (Id. at 208 (Adams testifying that Cherry was "the acting GF on the streets"), 229, 814, 816, 818 (Morton testifying that "La controlled the jails and Show controlled the streets"; identifying Cherry as the "GF"); id. at 2896 (Rosario testifying that "Show" was "the undisputed leader of the streets" and was "godfather . . . for the streets"))

Cherry offers no evidence refuting the testimony of these three witnesses. Instead, Cherry argues that, if he were a senior leader of the Brims, "there would have been no reason for him to have been physically present for a shooting that he had ordered Morton by himself to commit."  (June 24, 2019 Cherry Sent. Br. (Dkt. No. 669) at 6 (emphasis omitted); see also Jan. 6, 2020 Cherry Sent. Br. (Dkt. No. 807) at 8 ("It . . . defies credulity that Cherry himself – the purported godfather of [the Brims] and mastermind of the Kaid shooting – would not only go along for the ride but also invite a nonviolent eyewitness who was not a gang member."))

Cherry's appeal to logic is not persuasive. The uncontroverted and credible evidence before the Court supports a finding that Cherry was the acting Godfather of the Brims between Johnson's incarceration in 2008 and Johnson's expulsion of Cherry from the gang in 2010. Accordingly, to the extent that Cherry objects to the PSR's finding that he was the Acting Godfather of the Brims, his objection is overruled.

### B.   Cherry's Expulsion from the Blood Hound Brims in 2010 and Continued Criminal Activity Thereafter

Cherry contends that he ceased to be a member of the Blood Hound Brims in mid-August 2010, after he informed Latique Johnson that he was romantically involved and had a child with Johnson's girlfriend. (June 24, 2019 Cherry Sent. Br. (Dkt. No. 669) at 3) Accordingly, Cherry objects to the PSR to the extent that the PSR represents that he was a member of the Brims through 2011 or 2012. (PSR ¶¶ 17, 19)

Neither side disputes the fact that Johnson expelled Cherry from the Brims in 2010 when he learned of Cherry's relationship with Johnson's girlfriend. (Nov. 26, 2019 Hrg. Tr. (Dkt. No. 796) at 10; see also Trial Tr. 1273 ("Once La found out that Show was the father, Show was out. Like, he wasn't a Hound after that."); August 15, 2019 Govt. Sent. Br. (Dkt. No. 725) at 4-5)) Indeed, as a result of Cherry's conduct with Johnson's girlfriend, Johnson ordered Morton to kill Cherry. (Nov. 26, 2019 Hrg. Tr. (Dkt. No. 796) at 10-11, 64)

Accordingly, Cherry's objection to the PSR is sustained to the extent that the PSR states or suggests that Cherry was a member of the Brims in 2011 or 2012.

The Government contends, however, that this Court should consider Cherry's continued criminal activity – selling drugs in Binghamton – and his smuggling of drugs and

contraband into jail for Brims members – in sentencing Cherry.[15]  (August 15, 2019 Govt. Sent. Br. (Dkt. No. 725) at 5)

        According to the Government, after Cherry was expelled from the Brims, Cherry introduced Morton to an individual in Binghamton who supplied Morton with heroin and crack cocaine.  (Id. (citing Trial Tr. 879-80, 882))  Cherry later moved to Binghamton and "took over Morton's role in the Binghamton drug operation" while Morton was incarcerated.  (Id. at 5-6; see also Ex. D (listing Cherry's address in August 2011 as Morton's house in Binghamton); Ex. E (listing the same house as Cherry's residence when Cherry visited Morton in jail in January 2013))  The Government also submitted photographs of Cherry (1) displaying large quantities of cash during the period between June 2012 and February 2013; and (2) "throwing up the Brims gang sign" with others in May 2014.  (Id. at 6, Ex. F (Dkt. No. 725) at 81)

        Cherry counters that "evidence of [his] prior drug dealing is of little value" at sentencing because (1) this conduct followed his expulsion from the Brims; and (2) "Cherry was already previously convicted and sentenced for the drug-dealing activity" that the Government highlights, and he should not be punished for that conduct again.  (Jan. 6, 2020 Cherry Sent. Br. (Dkt. No. 807) at 15-16)

        This Court concludes that Cherry and Morton were engaged in drug trafficking even after Cherry was expelled from the Brims.  (See Nov. 26, 2019 Hrg. Tr. (Dkt. No. 796) at 67-72)  Although Cherry was convicted and sentenced in state court for his drug trafficking in

---

[15]  Although Cherry initially objected to the PSR's assertion that he smuggled contraband into prison and facilitated others doing the same (June 24, 2019 Cherry Sent. Br. (Dkt. No. 669) at 7), he did not repeat these arguments in his post-hearing submission.  (See Jan. 6, 2020 Cherry Sent. Br. (Dkt. No. 807))  In any event, Cherry has offered no reason for this Court to reject the trial and Fatico hearing testimony concerning this subject.  Accordingly, to the extent that Cherry contends that he did not engage in the smuggling of contraband items into prisons during and after his membership in Brims, this Court overrules his objection.

Binghamton, this Court may consider at sentencing the fact that Cherry continued his drug trafficking with Morton even after his expulsion from the Brims. Cherry's objection to the PSR's reference to this activity is overruled.

As to the hand gesture shown in a May 2014 photograph of Cherry, the Government contends that it is a Brims gang sign, while Cherry argues that he was displaying a "rock and roll" hand symbol. (Jan. 6, 2020 Cherry Sent. Br. (Dkt. No. 807) at 16-18; Ex. O) It is unnecessary for this Court to resolve the parties' factual dispute, because this photograph will play no role in the Court's sentencing of Cherry.

### C.   **Attempted Murder of Saeed Kaid**

Cherry objects to that portion of the PSR stating that he ordered Morton to kill Saeed Kaid. (PSR ¶ 22) Morton testified at trial and at the <u>Fatico</u> hearing – in significantly greater detail – about the attempted murder of Kaid, stating that Cherry had ordered Kaid's murder because Kaid had challenged his authority and right to be the gang's Acting Godfather. This Court finds Morton's account of this incident fully credible.

Cherry offers a counter-narrative from his friend Ralph Turane, who was present in the car when Kaid was shot. For the reasons stated below, Turane's account is entitled to little weight.

As discussed above, Turane asserted his Fifth Amendment privilege in response to all substantive questions regarding what took place on the evening that Kaid was shot. (Aug. 27, 2019 Hrg. Tr. (Dkt. No. 735) at 12-13, 22-42, 49) As a result, Turane's account was not tested by cross-examination, and thus "may not be worth much in the absence of corroboration." <u>United States v. Thompson</u>, No. 10 CR. 94 JSR, 2010 WL 3069668, at *5 (S.D.N.Y. July 29, 2010) (giving little weight to hearsay statements of defendant who chose not to testify). Courts

25

"'give greater weight to [witness] testimony, which was subject to cross examination."  United States v. Robles, 253 F. Supp. 2d 544, 549 n.14 (S.D.N.Y. 2002) (quoting United States v. Gardner, 611 F.2d 770, 774 n. 2 (9th Cir. 1980))  This principle applies even where an adversary has submitted an affidavit or declaration, see id. (citing United States v. Frank, 8 F. Supp. 2d 284, 291 n.2 (S.D.N.Y. 1998) (crediting witness testimony over affidavit "because the affidavit was not subject to cross-examination" and the testifying witnesses were credible)); see also United States v. Taylor, No. 11 CR. 310 PGG, 2011 WL 4357350, at *4 n.12 (S.D.N.Y. Sept. 19, 2011) ("While this Court has considered both Taylor's declaration and the officers' testimony on the issue of probable cause, the latter is entitled to more weight, because it was subject to cross-examination and is found by this Court to be credible."); United States v. Fuentes, No. 07 Cr. 329 (SHS), 2007 WL 2319142, at *4 (S.D.N.Y. Aug. 10, 2007) (crediting witness testimony over defendant's sworn statement); United States v. Long Huang You, 198 F. Supp. 2d 393, 400 n.8 (S.D.N.Y. 2002) (same); United States v. Juliano, No. 99 Cr. 1197 (AGS), 2000 WL 1206745, at *3 n.1 (S.D.N.Y. Aug. 24, 2000) (affording less weight to defendant's affidavit, because the court could not assess the defendant's credibility and the testimony of Government witnesses was "forthright and truthful"), and applies a fortiori to out-of-court statements such as Turane's account, which was not provided under oath and was recorded without his knowledge or consent. (Aug. 27, 2019 Hrg. Tr. (Dkt. No. 735) at 8)  Accordingly, "the Court places little weight on [Turane's account] insofar as it conflicts with the consistent and credible live testimony from the [cooperating witnesses] that was subjected to vigorous cross-examination."  United States v. Deleston, No. 15-CR-113 PKC, 2015 WL 4745252, at *5 (S.D.N.Y. July 24, 2015).

There are multiple reasons to question the credibility of Turane's account.  As an initial matter, Turane is a "good friend[]" of Cherry; they grew up together in the same Harlem

neighborhood.  Turane visited Cherry in prison, and Turane contacted Cherry when Turane was incarcerated.  Turane falsely listed Cherry as his "cousin" on his approved prison phone list. (Aug. 27, 2019 Hrg. Tr. (Dkt. No. 735) at 46-47, 49-53)  Turane has multiple prior convictions for drug trafficking, as well as a conviction for attempted identity theft, which involved his attempt to negotiate a forged check at a bank.[16]  (Id. at 21-22, 54-56)

Moreover, the account Turane gave to Cherry's counsel is not reliable, because counsel fed information to Turane throughout the interview.  (See, e.g., June 24, 2019 Cherry Sent. Br., Ex. D (Dkt. No. 669-4) at 4 (telling Turane that Kaid was the person Morton shot), 5 (correcting Turane's response as to when he first met Morton), 9 (suggesting that "Morton wasn't going to the party"), 15 ("You can't recall what, you know, what major roadway he got on but he probably got on the Major Deegan eventually."), 19 ("You don't know this guy that well . . . You ask David to ask him where the hell you're going?"), 28 (suggesting that Turane was afraid that Morton would shoot Cherry; suggesting that there were four or five shots at the murder scene))

For all these reasons, the Court affords very little weight to Turane's account of events on the night of the Kaid attempted murder.[17]

By contrast, Morton was subjected to extensive cross-examination – amounting to hundreds of transcript pages – at trial and at the Fatico hearing.  (See Trial Tr. 1053-1159, 1165-80, 1186-1277; Nov. 26, 2019 Hrg. Tr. (Dkt. No. 796) at 83-125)  And Morton's testimony was

---

[16]  When called to testify at Cherry's Fatico hearing, Turane had an open warrant for an alleged drug trafficking offense in Vermont.  (Aug. 27, 2019 Hrg. Tr. (Dkt. No. 735) at 59-60; GX 102)
[17]  It is worth noting that Turane's account also makes no sense.  According to Turane, he and Cherry were dressed for, and believed that they were headed to, a party in Harlem.  (June 24, 2019 Cherry Sent. Br., Ex. D (Dkt. No. 669-4) at 7-9)  But despite these alleged circumstances, no one in the car substantively objected when Morton – instead of driving to the party in Harlem – got on a highway and headed north into Westchester County.

corroborated by testimony from Rosario and Adams, two other longtime Brims members, who had become cooperating witnesses.  Rosario testified that Kaid told him that Cherry "had set him up," and "that the reason they tried to kill [Kaid] was because they feared that [Johnson] was going to give [Kaid] a higher position than [Cherry] already had."  (Trial Tr. 2931)  Adams testified that Morton told him that he had shot Kaid "because O-Dog was running his mouth about Showtime."  (Id. at 577)

In response to this evidence, Cherry raises jury arguments that are not persuasive here, including that (1) "there would have been no reason for . . . Cherry to have touched the murder weapon himself after Morton had shot [Kaid] a number of times"; (2) "there would have been absolutely no reason to invite [Turane] – a non-gang member – as an eyewitness to a murder"; (3) Kaid had no weapon, although he had allegedly been told that the group was planning to rob a drug dealer; and (4) Kaid's cell phone and keys were recovered from the scene of the attempted murder.  (June 24, 2019 Cherry Sent. Br. (Dkt. No. 669) at 6 (emphasis omitted); Jan. 6, 2020 Cherry Sent. Br. (Dkt. No. 807) at 5-7)  These arguments do not undermine confidence in Morton's account.[18]

Cherry further contends that "Morton shot . . . Kaid because of a dispute over money," pointing to a statement Kaid made to the police shortly after the shooting.  (Jan. 6, 2020 Cherry Sent. Br. (Dkt. No. 807) at 2-4)  Morton testified, however, that his shooting of Kaid was unrelated to the $100 debt Kaid owed on a heroin transaction.  According to Morton, he shot

---

[18]  Given that the attempted murder of Kaid was at Cherry's volition, it makes sense that Cherry would want to shoot Kaid as well.  As to the presence of Turane, from the record evidence, it is reasonable to infer that there was a relationship of trust between Cherry and Turane.  As to Kaid's failure to bring a gun, it is reasonable to infer that Kaid believed that those who had planned the purported robbery would likely bring firearms.  And the fact that Kaid brought his keys and cellphone does not demonstrate that he did not believe that the group was planning to commit a robbery that evening.

Kaid at Cherry's direction. (Nov. 26, 2019 Hrg. Tr. (Dkt. No. 796) at 84-85, 89-90, 102)

Morton's testimony is credible on this point,[19] and the credibility of Kaid's statement after the

shooting is significantly undermined by his later remark to Rosario "that Showtime had set him

up" and attempted to kill Kaid as the result of a power struggle within the gang. (Trial Tr. 2931)

   Having observed Morton's demeanor at trial – including through many hours of

vigorous cross-examination – and at the <u>Fatico</u> hearing, the Court concludes that he was a

credible and compelling witness, and credits his account of the attempted murder of Saeed Kaid.

Accordingly, Cherry's objections to the PSR are overruled to the extent they are premised on the

PSR's assertion that the attempted murder of Kaid was carried out at Cherry's behest.

  **D.**   **The Trattoria Amici Shooting**

   Cherry also objects to the PSR's statement that he "fired a gun at rival gang

members" on May 23, 2010, outside the Trattoria Amici bar-restaurant, which "result[ed] in the

injury of two victims." (PSR ¶ 23)

   Morton testified that he and Cherry had a joint birthday party at a lounge near

Harlem Hospital in May of 2009 or 2010. Both he and Cherry were carrying guns that evening;

they were able to carry the guns into the club because Morton's brother – who is a party

promoter – was working at the door and let them in. During the party a scuffle ensued between a

number of Brims and other attendees. A shooting took place outside the club. Cherry told

Morton – outside the club – that he had shot a woman. (Nov. 26, 2019 Hrg. Tr. (Dkt. No. 796) at

54-57)

---

[19]  With respect to Cherry's appeal to logic, if Morton shot Kaid over a $100 heroin debt, why did he drive Cherry and Turane north to Westchester County to witness the shooting arising from this personal dispute?

Cherry later told Morton about an incident in which "parole or probation" had come to his apartment.  Cherry threw two guns "out the window," including the gun that he had used on the evening of the birthday party.  The guns that Cherry threw out the window were later recovered by law enforcement.  (Id. at 57-58)  The Government has submitted police reports and ballistics evidence indicating that Cherry later pleaded guilty to possessing the firearm that was used to commit the shooting outside Trattoria Amici.

In September 2011, Cherry was charged with criminal possession of a weapon in the third degree.  (Aug. 15, 2019 Govt. Sent. Br., Ex. J (Dkt. No. 725) at US_010157)[20]  Cherry pleaded guilty to that offense in state court.  During his allocution, Cherry stated that he had possessed a firearm and ammunition, and that the firearm "got tossed out of the window."  (Id. at US_016107)  The firearm was a 9 mm. semi-automatic pistol.  (Id. at US_010158)

The Government arranged for a ballistics examination to be conducted of the 9 mm. handgun that Cherry had "tossed out the window."  The New York City Police Department Police Laboratory, Firearms Analysis Section, compared 9 mm. spent cartridge casings recovered from the scene of the Trattoria Amici shooting with cartridge casings test-fired from Cherry's 9 mm. Luger handgun.  (See id. at US_010164 (NYPD property clerk invoice referencing shell casings recovered on May 23, 2010 "in regards to an Assault/shooting from 100 West 130 Street" with voucher number R390421); id. at US_010167 (NYPD property clerk invoice for the 9 mm. firearm that was the subject of Cherry's state court guilty plea))  A report from the NYPD's Firearms Analysis Section states that "[a] microscopic examination and comparison of the above evidence revealed" that test fires and the spent cartridge casings "were discharged from the **SAME** firearm."  (Id. at US_010163 (emphasis in original))

---

[20]  This exhibit was filed under seal and thus does not bear ECF pagination.

Cherry contends that this Court should not consider the Government's ballistics evidence, because he "has not had an opportunity to confront or test the ballistics evidence." "Relying on an expert conclusion that . . . Cherry has not had an opportunity to confront runs counter to his due process rights and is therefore impermissible."  (Jan. 6, 2020 Cherry Sent. Br. (Dkt. No. 807) at 11-13)

Cherry's Confrontation Clause argument is not persuasive.  "Both the Supreme Court and [the Second Circuit] . . . have consistently held that the right of confrontation does not apply to the sentencing context. . . ."  United States v. Martinez, 413 F.3d 239, 242 (2d Cir. 2005) (collecting cases).  Moreover, the Government provided the ballistics evidence to Cherry before the Fatico hearing (see Aug. 15, 2019 Govt. Sent. Br., at 10 and Ex. J (Dkt. No. 725)), and Cherry never sought to examine the ballistics expert or to call his own ballistics expert. Accordingly, Cherry has presented no basis for this Court to disregard the ballistics evidence, which corroborates Morton's testimony that Cherry was responsible for the Trattoria Amici shooting.[21]  Accordingly, Cherry's objection to Paragraph 23 of the PSR is overruled.

_____

[21]  Cherry contends that this Court should rely on Turane's statement to Cherry's counsel that Gerard Woodley, and not Cherry, was the shooter that night.  (June 24, 2019 Cherry Sent. Br., Ex. D (Dkt. No. 669-4) at 44-47)  As discussed above, Turane's statements to Cherry's counsel are not reliable.  Moreover, Morton's testimony that Cherry was responsible for the Trattoria Amici shooting is corroborated by the ballistics evidence.

## **<u>CONCLUSION</u>**

          For the reasons stated above, Cherry's objections to the PSR are overruled, except as to his expulsion from the Brims in 2010.[22]

Dated: New York, New York
       June 1, 2021

                              SO ORDERED.

                              *Pauls Gardephe*

                              Paul G. Gardephe
                              United States District Judge

---

[22]  In a May 13, 2021, supplemental sentencing submission, Cherry argues that a new declaration from Stephen Adams "directly contradicts the trial testimony of his brother, cooperating witness Michael Adams."  (May 13, 2021 Cherry Ltr. (Dkt. No. 986) at 1-2)

Stephen Adams' declaration has no bearing on the factual issues that are the subject of this opinion.  Moreover, as discussed below, there is no reason to credit Stephen Adams' recent declaration.

At trial, Michael Adams testified that Johnson ordered Kaid to shoot members of the MacBallas gang, and that Kaid fired two shots in a fall 2012 drive-by shooting.  (Trial Tr. at 314, 320, 642) In his March 7, 2021 declaration, Stephen Adams asserts that he – and not his brother – shot at members of the rival gang as the result of a personal dispute, and that Johnson did not order the shooting.  (Mar. 7, 2021 Stephen Adams Decl. (Dkt. No. 980-1) at 1-2)

According to Cherry, Stephen Adams's declaration proves that Michael Adams's "testimony is demonstrably false," and "underscores the pervasive use of cooperating witnesses in this case who have lied to further their own interests and/or to protect others."  (May 13, 2021 Cherry Ltr. (Dkt. No. 986) at 2)

The Government counters that "there is no reason for the Court to credit this belated confession by [Stephen Adams, who is] already serving a multi-decade sentence for murder and related charges."  The Government also notes that Stephen Adams was recently transferred to a prison facility housing Johnson.  (May 18, 2021 Govt. Ltr. (Dkt. No. 989) at 1-2)

The Court concludes that Stephen Adams's declaration provides no basis to sustain Cherry's objections to the PSR.